[Cite as *State v. Anthony*, 2013-Ohio-2955.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 12 JE 2 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| JOSEPH ANTHONY, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:         Criminal Appeal from Common Pleas
                                  Court, Case No. 11 CR 142.

JUDGMENT:                         Conviction Affirmed.
                                  Remanded For Resentencing.

APPEARANCES:
For Plaintiff-Appellee:           Attorney Jane Hanlin
                                  Prosecutor
                                  Attorney George Sarap
                                  Assistant Prosecutor
                                  Jefferson County Justice Center
                                  16001 State Route 7
                                  Steubenville, OH  43952

For Defendant-Appellant:          Attorney Eric Reszke
                                  Suite 810
                                  Sinclair Building
                                  Steubenville, OH  43952

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                                  Dated:  June 21, 2013

DeGenaro, P.J.

{¶1} Defendant-Appellant, Joseph Anthony, appeals the decision of the Jefferson County Court of Common Pleas, convicting him of one count of burglary and sentencing him accordingly. He contends that his sentence was erroneous and his conviction was against the manifest weight of the evidence. Anthony's assignments of error are meritless in part and meritorious in part. First, Anthony's conviction was not against the manifest weight of the evidence. Second, although Anthony's sentence was within the statutory range and the length was reasonable based upon the applicable sentencing factors, the trial court erred by failing to properly notify Anthony regarding the details of his post-release control and by failing to include the consequences for violating those conditions in the sentencing entry. Accordingly, Anthony's conviction is affirmed, his sentence is affirmed in part and the case remanded for a limited post-release control resentencing hearing pursuant to R.C. 2929.191(C).

## Facts and Procedural History

{¶2} On September 7, 2011, the Jefferson County Grand Jury indicted Anthony on one count of burglary (R.C. 2911.12(A)(3)), a third-degree felony. The case proceeded to a jury trial during which the State presented testimony from multiple witnesses to set forth the facts of the burglary. On the evening of July 15, 2011, Doris Welday's house on Wheatley Street in Empire was burglarized. At the time of the burglary, Welday was in the hospital and her daughter, Carol Westbrook, was taking care of the house and had Power of Attorney for Welday.

{¶3} Between 9:30 and 10:00 p.m. on July 15, Carol received a phone call from a neighbor alerting her that the security lights had been activated at Welday's house. Carol's husband, Randy, and her younger son went to check on the house. First, they went up the ramp to the back porch and saw the door was still locked. They then observed that the basement door underneath the porch was open. According to Randy, nobody could have broken in from the outside because a bar holds the door shut and he had locked and secured the door earlier. The basement was dark and they did not have flashlights, but they could hear movement inside the basement. In the meantime, one of Welday's relatives had called the police. Randy and his son waited outside the house

until Police Chief Matthew Donahue arrived.

{¶4} When Chief Donahue arrived, he announced his presence at the basement door. Shortly thereafter, Elizabeth Keenan exited the basement. Keenan is Welday's granddaughter and Carol and Randy's niece. Keenan lived with her mother next door to Welday's house. At the time, Anthony, Keenan's long-term boyfriend, lived with her and her mother. According to Carol, neither Keenan nor Anthony had permission to be in Welday's house. Carol also explained that Randy called her to bring the keys to the house over. Her older son picked her up and drove her over, and they arrived as Keenan was coming out of the basement.

{¶5} After Keenan exited the basement, the Chief asked her what she was doing in the house, and at first she said that she needed food from the freezer. The family members advised him that the freezer was upstairs on the back porch, not in the basement. Keenan then said that she heard a noise in the house. Chief Donahue placed Keenan into custody, handcuffed her with her hands behind her back and secured her in the back of his vehicle. Keenan complained that the handcuffs were cutting into her wrists, which the Chief explained is a normal reaction.

{¶6} Chief Donahue then performed a scan of the house. He asked the family to enter and told them not to touch anything but to advise him if anything was missing. Carol noticed that a flat-screen television was missing from the entertainment center in the living room and some figurines were missing that were usually in front of the television. The television was discovered in the basement. According to the Chief, the inside of the house was not damaged and the figurines were placed at the bottom of the television console.

{¶7} Chief Donahue then searched for a point of entry; he testified that he did not believe it was the basement door because the door had been locked with the bar and the door was not damaged. The front of the house had an enclosed porch. The Chief found a tire iron lying on the porch next to a window. He saw that the window had pry marks underneath it and the latches were broken. The window led into the living room and the curtains and blinds were pushed aside over the couch. He believed that this window was

the point of entry.

{¶8} After he detained Keenan at the Welday residence, the Chief diffused an altercation between Carol's son and Anthony near Anthony's residence on Wheatley. He did not arrest Anthony that night. Later that evening, when he took Keenan to the Sheriff's Department, he asked her if Anthony was involved in the burglary and Keenan said no.

{¶9} Chief Donahue contacted Agent Edward Lulla, a crime scene investigator with the Ohio Bureau of Criminal Investigation, who conducted an investigation of the scene the next morning. Agent Lulla fingerprinted the window inside the porch, the television, and some of the figurines. The fingerprint evidence was very poor quality and there was not enough ridge detail to make a comparison with a known fingerprint. Agent Lulla explained that fingerprints could last for years on a surface if the surface is not wiped off or does not come into contact with water. DNA evidence was not taken from the scene.

{¶10} According to Chief Donahue, while he was investigating the burglary, Keenan was not very helpful, so he asked Sheriff Abdalla to speak with her. Keenan gave a statement to the Sheriff that Anthony was involved in the burglary; Anthony was arrested after Keenan made this statement.

{¶11} The State also presented testimony from two witnesses in order to link Anthony to the burglary: Keenan and Linda Adkins.

{¶12} Keenan testified that she pled guilty to burglary and is currently incarcerated at the East Ohio Correctional Center. She testified that Anthony was with her on the night of the burglary. At that time, they had been in a relationship for almost six years. She explained that towards the end of their relationship, Anthony had become aggressive and violent. She later admitted that her mother owned the house that she lived in and could have forced Anthony to leave. She stated that her mother making Anthony leave had been "in the process of happening."

{¶13} Keenan claimed that the burglary was Anthony's idea, and she agreed to it. On that night, she went to the back of the house and while she walked backed there, she

heard the trunk door of Anthony's vehicle close. She explained that he kept his tools to change a tire in the trunk, such as crowbars. She also stated that Anthony was wearing black gloves that night.

{¶14} Keenan walked up the ramp to the back porch, but the door and window in the back were not open. She went back down the ramp, activating the motion light, and went under the back porch where the basement door is located. At that point, the basement door swung open and Anthony was at the door. Keenan testified that she went into the house and a few minutes later, Anthony came back down the basement steps with the television. Keenan explained that she could not have carried the television down the stairs because she is unable to lift heavy objects due to a hernia and degenerating disc disease of the spine.

{¶15} Keenan testified that Anthony left the house through the basement door when headlights from a vehicle pulling into the driveway flickered in the window of the basement. She explained that she did not leave because she was "dumbfounded" and did not know what to do. She explained that when the Chief asked her if Anthony was involved, she said no because she was afraid that if he found out that she informed on him, he might hurt her or her family. When she met with Sheriff Abdalla, he asked her for a statement but did not make any promises to her. She said that she voluntarily told the Sheriff about Anthony's involvement in the burglary. Keenan stated that she was released from the Sheriff's Department on a medical release due to stomach and liver problems.

{¶16} Keenan stated that her testimony that day would not impact the sentence she received and she was just told to be honest. She said that she has no prior felony or theft convictions. She later testified that the State's recommendation that she receive six months at the East Ohio Correctional Center was based on her lack of a prior record. She confirmed that at her sentencing hearing, the State made the sentence recommendation before she gave her statement about Anthony's involvement.

{¶17} On cross, Keenan admitted that she does not receive any type of disability payments for her physical problems. She also admitted that she had physical issues prior

to making the statement about Anthony's involvement in the burglary, but she was released on medical leave from the Sheriff's Department after she made the statement. Keenan agreed that when she pled guilty, she was facing up to three years imprisonment, but she received probation, which included six months at Eastern Ohio Correctional Center. She confirmed that her attorney and the prosecutor made a joint recommendation for probation and in turn she agreed to testify against Anthony.

{¶18} Keenan confirmed that she admitted in her statement to Sheriff Abdalla that she had a drug problem but she was no longer using drugs. She admitted that her drug problem was ongoing and that she had lied to Sheriff Abdalla. She stated that the plan was to steal something in order to purchase drugs.

{¶19} Keenan admitted that she lied to her family and Chief Donahue about her reasons for being in Welday's house. She confirmed that she did not mention Anthony wearing gloves or that he got a crowbar out of his trunk in her statement to Sheriff Abdalla, although the statement did say that Anthony decided to break the lock with a tire iron. She also did not mention the gloves or that Anthony got the crowbar from the trunk at her change of plea hearing. She explained that she was not asked about it and she only answered the questions asked. She also confirmed that she had testified at the plea hearing that on the night of the burglary, her family arrived at the basement door before she could walk out and she did not mention standing there "dumbfounded." She admitted that she had the remote control for the television and she dropped it in the grass outside Welday's house. She agreed that this was a deceptive act.

{¶20} Linda Adkins also testified for the State. She lives on Wheatley Street near Welday's house. She knows Keenan and Anthony, and she identified Anthony in the courtroom. On the night of the burglary, Adkins was in a park located directly across the street from Welday's house. She observed Anthony go up the front steps of the house to the enclosed porch, and she did not see him come back down the steps. She also saw Keenan going up the back ramp of the house. She instructed a neighbor girl to alert Welday's relatives. She also observed the police later bring Keenan out of the house and put her in a police car. On cross, Adkins testified that she did not see Anthony's hands

and she agreed that in her statement to the police, she did not say that he was carrying a crowbar. She confirmed that she did not see Anthony enter or exit the house.

{¶21} After the witnesses' testimony, the State rested. The defense made a motion for acquittal, pursuant to Crim.R. 29(A), which the court overruled. Anthony chose not to testify and the defense rested. Following deliberations, the jury returned a verdict finding Anthony guilty of one count of burglary (R.C. 2911.12(A)(3)).

{¶22} After the jury was excused, the court held a sentencing hearing. During the hearing, defense counsel made an oral motion for an appeal bond which the trial court later denied. The trial court found that Anthony had served a prior prison term for burglary in 2003 in Jefferson County Case No. 03-CR-34. In a February 6, 2012 judgment entry, the trial court sentenced Anthony to 30 months in prison.

## Manifest Weight

{¶23} In his second of two assignments of error, which we address out of order for clarity of analysis, Anthony asserts:

{¶24} "The jury verdict of guilty to the offenses of burglary was against the manifest weight of the evidence."

{¶25} When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶26} This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction. *Thompkins* at 387. This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses. *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, ¶36 (7th Dist.); *State v. DeHass*, 10

Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible. *State v. Mock*, 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, ¶40 (7th Dist.).

**{¶27}** Anthony focuses his manifest weight argument on challenging Keenan's credibility. He notes that the State's case rests significantly on Keenan's testimony, as she was the only witness who placed him inside the Welday residence during the burglary. He contends that Keenan was not a credible witness due to inconsistencies in her testimony, her admissions of lying and drug use, and the fact that she originally stated that Anthony was not involved in the burglary but later changed her story and implicated Anthony.

**{¶28}** Anthony has pointed out several factors for the jury to consider in judging Keenan's credibility. Keenan admitted that she had used drugs and lied about her drug usage to Sheriff Abdalla. She also admitted that she lied about her reasons for being in Welday's house on the night of the burglary and dropped the remote control in the grass in order to deceive Chief Donahue. Further, she initially denied Anthony's involvement in the burglary but later changed her story. She was released on medical leave after she gave the statement implicating Anthony, but she did not have proof of her medical issues beyond her own testimony. Finally, there was testimony of the joint recommendation for probation in exchange for Keenan to testify against Anthony.

**{¶29}** Despite these factors which could undermine her credibility, a reasonable juror could still believe her testimony. Keenan explained that she did not initially admit Anthony's involvement in the burglary because he had been violent towards her before and she feared for her safety and the safety of her family. Furthermore, she testified that Sheriff Abdalla did not make any promises to her in exchange for her statement. Finally, she testified that she had no prior record and the joint recommendation for probation was entered before she gave her statement at the change of plea hearing.

**{¶30}** Moreover, several of the inconsistencies in Keenan's testimony are not

actually inconsistent. Anthony claims that Keenan did not mention the black gloves or the tire iron to Sheriff Abdalla. While Keenan admitted she did not mention the gloves, she did state that Anthony decided to use a tire iron to break the lock. While she did not say that he obtained the tire iron from his trunk, this appears to be a less important detail. Anthony also argues that Keenan's testimony regarding flickering lights conflicts with Randy's testimony that he and his son did not have flashlights. Keenan testified that the lights were actually headlights pulling into the driveway. Although it is not clear whose vehicle was pulling into the driveway, this ambiguity in Keenan's testimony does not completely undermine her credibility. Finally, Anthony contends that Keenan's claim that Anthony was wearing gloves conflicts with Agent Lulla's testimony that he obtained fingerprint evidence from the television and window. This is not a contradiction because Agent Lulla also testified that fingerprints can remain in place for years; thus, these fingerprints could have belonged to someone other than Anthony.

**{¶31}** Significantly, Keenan's version of the events is bolstered by Adkins' testimony. Adkins stated that she saw Anthony climb the stairs to the enclosed porch on the night of the burglary and she did not see him go back down the stairs. Chief Donahue found the tire iron next to the window inside the enclosed porch, and he believed that this window was the point of entry into the house. Adkins also observed Keenan walking up the back ramp of the house, which supports Keenan's testimony. Anthony's attempts to undermine Adkins' testimony by noting she did not see him enter the house and she did not notice the black gloves and tire iron do not preclude Adkins' testimony from bolstering Keenan's claims of Anthony's involvement. Defense counsel did not elicit any testimony to show that Adkins had a reason to fabricate her testimony, and her testimony places Anthony nearby the point of entry at the time of the burglary.

**{¶32}** The jury believed Keenan's testimony that Anthony was involved in the burglary. "[D]eterminations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of fact." *State v. Funkhouser*, 7th Dist. No. 02-BA-4, 2003-Ohio-697, ¶8, citing *DeHass*, supra, at paragraph one of the syllabus. Because the jury was in a better position to assess the witnesses' testimony, and a reasonable juror

could find Keenan's testimony credible, this is not the exceptional case where the jury created a manifest miscarriage of justice. Anthony's conviction was not against the manifest weight of the evidence. Accordingly, his second assignment of error is meritless.

## Sentence Review

**{¶33}** In his first and final assignment of error, Anthony asserts:

**{¶34}** "The trial court committed reversible error in sentencing the defendant to thirty (30) months imprisonment."

**{¶35}** When reviewing a felony sentence, an appellate court first reviews the sentence to ensure that the sentencing court clearly and convincingly complied with the applicable laws. *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶4. A trial court's sentence would be contrary to law if, for example, it were outside the statutory range, in contravention to a statute, or decided pursuant to an unconstitutional statute. *Id.* at ¶15. If this inquiry is satisfied, an appellate court then reviews the trial court's sentencing decision for abuse of discretion. *Id.* at ¶17, 19-20. The term 'abuse of discretion' means an error in judgment involving a decision that is unreasonable based upon the record; that the appellate court merely may have reached a different result is not enough. See, *Bergman v. Bergman,* 2d Dist. No. 25378, 2013-Ohio-715, ¶9; *Hall-Davis v. Honeywell, Inc.,* 2d Dist. Nos.2008 CA1, 2008 CA 2, 2009-Ohio-531, ¶35.

**{¶36}** Turning to the first *Kalish* inquiry, the 30 month sentence was within the statutory range; the trial court could have sentenced Anthony from 9 months to 36 months in prison. R.C. 2929.14(A)(3)(b). In the sentencing entry, the trial court also stated that it considered R.C. 2929.11 and R.C. 2929.12. "A trial court speaks through its journal entries." *State v. Murphy*, 2d Dist. No. 2010 CA 81, 2011-Ohio-5416, ¶18, citing *State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶47. Further, Anthony was afforded his allocution rights pursuant to Crim.R. 32(A)(1), when the trial court addressed him and asked him if he had anything to say..

**{¶37}** Although neither party raised this issue, the trial court did not properly advise Anthony regarding post-release control, even though he could be subject to a

discretionary period of up to three years.  R.C. 2967.28(C) provides in pertinent part:

> Any sentence to a prison term for a felony of the third, fourth, or fifth degree
> that is not [a sex offense or an offense during which the offender caused or
> threatened physical harm] shall include a requirement that the offender be
> subject to a period of post-release control of up to three years after the
> offender's release from imprisonment, if the parole board, in accordance
> with division (D) of this section, determines that a period of post-release
> control is necessary for that offender.

**{¶38}**  Further, R.C. 2929.19(B)(2)(e) provides that at the sentencing hearing, the trial court must notify the offender that if a period of supervision is imposed following his or her release from prison, and if the offender violates that supervision, then the parole board may impose a prison term of up to one-half of the prison term originally imposed on the offender.  The trial court must also include this notice in the sentencing entry.  *State v. Pullen*, 7th Dist. No. 11 MA 10, 2012-Ohio-1498, ¶9 (analyzing former R.C. 2929.19(B)(3)(e)), citing *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958, ¶11, 22.

**{¶39}**  At the sentencing hearing, although the trial court properly advised Anthony of the consequences for violating the conditions of post-release control, it misstated the term: "the parole board will have the right and the authority to put conditions and restrictions on your release *for a period of 3 more years.*"  (emphasis added.)  Moreover, the sentencing entry did not mention the consequences of violating post-release control and misstated that Anthony would be subject to post-release control "at the option of the Parole Board * * * *for a period of three (3) years* pursuant to Oho [sic.] Revised Code Section 2967.28(C)."  (emphasis added.)

**{¶40}**  The Ohio Supreme Court has recently instructed that when a case involves a failure to notify a defendant about post-release control only in the sentencing entry, that error may be corrected through a nunc pro tunc entry without a resentencing hearing.  *State v. Qualls*, 131 Ohio St.3d 499, 2012-Ohio-1111, 967 N.E.2d 718, at syllabus.  The

Court further explained that this remedy is not available when the trial court fails to provide proper notification at the sentencing hearing. *Id.* at ¶20. "[A] trial court must provide statutorily compliant notification to a defendant regarding postrelease control at the time of sentencing, including notifying the defendant of the details of the postrelease control * * *." *Id.* at ¶18. Further, for defendants sentenced after July 11, 2006, R.C. 2929.191 provides that the trial court can hold a resentencing hearing solely on the issue of post-release control and issue a corrected judgment entry. R.C. 2929.191(C); *Singleton* at paragraph two of the syllabus, ¶24.

{¶41} Here, the trial court erred by failing to include the consequences of violating the conditions of post-release control in the sentencing entry and by failing to inform Anthony at the sentencing hearing and in the entry that the period of post-release control could be up to three years, rather than a period of three years. *See State v. Smith*, 9th Dist. No. 11CA0115–M, 2012-Ohio-2558, ¶14. Because Anthony was sentenced after July 11, 2006, the trial court can hold a resentencing hearing solely on the issue of post-release control and issue a corrected judgment entry

{¶42} Turning to the second prong of the *Kalish* test, the trial court's overall sentence was not an abuse of discretion. Anthony argues that the trial court abused its discretion for several reasons: he had no prior delinquency adjudications, he had not served a previous prison term, he was employed at the time of the burglary, the State's case was weak in terms of the weight of the evidence, and his sentence was disproportionate to Keenan's sentence.

{¶43} Importantly, the trial court found that Anthony had served a prior prison term for a burglary conviction in 2003, which is an appropriate consideration during sentencing. Additionally, Anthony demonstrated no remorse during his allocution statement. As to Anthony's argument regarding Keenan's sentence, R.C. 2929.11(B) provides that a felony sentence shall be "consistent with sentences imposed for similar crimes committed by similar offenders." Although Keenan was sentenced to six months at the East Ohio Correctional Center and community control sanctions while Anthony received a 30 month prison term, Anthony's disproportionality argument is meritless; Keenan had no prior

convictions and thus was not a "similar offender." With regard to the remainder of Anthony's arguments, the trial court reasonably determined that the other factors, such as his prior conviction, weighed more strongly in favor of Anthony's 30 month sentence, which was not the maximum sentence he could have received. Finally, Anthony's conviction was not against the manifest weight of the evidence, as discussed in the second assignment of error.

**{¶44}** Therefore, although the trial court's sentence was reasonable, the court failed to properly notify Anthony regarding post-release control at the sentencing hearing and in the sentencing entry. Accordingly, Anthony's first assignment of error is meritorious in part.

**{¶45}** In sum, Anthony's assignments of error are meritless in part and meritorious in part. First, Anthony's conviction was not against the manifest weight of the evidence. Second, although Anthony's sentence was within the statutory range and the length was reasonable based upon the applicable sentencing factors, the trial court erred by failing to properly notify Anthony regarding the details of his post-release control and by failing to include the consequences for violating those conditions in the sentencing entry. Accordingly, Anthony's conviction is affirmed, his sentence is affirmed in part, and this case is remanded to the trial court for a limited post-release control resentencing hearing pursuant to R.C. 2929.191(C).

Donofrio, J., concurs.

Vukovich, J., concurs.